

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
INTERNATIONAL CREATIVE
METALS, INC.,

                Plaintiff,

- against -

H.E. SHAIKH SULTAN BIN KHALIFA
AL-NAHYAN CROWN PRINCE OF
THE EMIRATE OF ABU DHABI, et al.,

                Defendants.
---------------------------------------------------X

**REPORT AND
RECOMMENDATION**

01 CV 1624 (CBA)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ MAY 5  2004 ★
BROOKLYN OFFICE

      In this breach of contract action, plaintiff International Creative Metals, Inc. ("Creative Metals") seeks payment for work performed in designing and constructing massive metal gates and grills for the personal residence of defendant H.E. Shaikh Sultan Bin Khalifa Al-Nahyan, the son of the Crown Prince of the Emirate of Abu Dhabi.[1] Due to the financial difficulties caused by defendants' alleged breach of contract, plaintiff filed a voluntary petition for reorganization in the United States Bankruptcy Court for the Eastern District of New York, pursuant to Chapter 11 of the Bankruptcy Code. This action was subsequently commenced as an adversary proceeding on May 27, 1998, and removed to Federal District Court by Order of the Honorable John J. Connelly, U.S. Bankruptcy Judge, dated January 29, 2001.

      On January 4, 2002, plaintiff moved for an order authorizing the use of international registered mail as an alternative method of service of process of the summons and complaint in

---

[1] Although the Complaint alleges that Shaikh Sultan Bin Khalifa Al-Nahyan is the Crown Prince (Compl. ¶¶ 4, 7), plaintiff's expert, Herbert S. Wolfson, Esq., has indicated that he is in fact the son of the Crown Prince. (Wolfson Aff. ¶¶ 12-13).

this matter. Following the issuance of that Order, plaintiff served each of the defendants through the use of international registered mail. When the defendants failed to appear, a default was entered against them on February 21, 2003. The case was then referred to the undersigned for the purpose of conducting an inquest and to recommend an award of damages.

## FACTUAL BACKGROUND

Plaintiff Creative Metals, which is located in Queens, New York, is a metal sculpture business which creates architectural custom metal work. (Affirmation of Glen H. Ripa, Esq., dated March 27, 2003 ("Ripa Aff.") ¶ 3; Compl. ¶ 11). The company, which has been doing business worldwide since 1973, was contacted on December 27, 1987, by the defendant Architectural & Engineering Consultants (the "Architects"), regarding the construction of several massive metal gates and grills for the main entrance of the Royal Palace of the Crown Prince of the Emirate of Abu Dhabi. (Compl. ¶¶ 10, 12).

After submitting a bid based on drawings and designs provided by the Architects, who were in charge of designing the Royal Palace, plaintiff was awarded the project. (Id. ¶¶ 13-14). On May 28, 1989, an acceptance of the agreement to construct the gates and grills was sent to plaintiff on behalf of the Diwan[2] and the Crown Prince of the Emirate of Abu Dhabi, H.E. Shaikh Sultan Bin Khailifa Al-Nahyan (the "Crown Prince"). (Id.)

---

[2] The Diwan of H.H., The Crown Prince of the Emirate of Abu Dhabi ("Diwan") is, according to plaintiff, a private organization existing under the laws of the Emirate of Abu Dhabi for the purpose of transacting foreign and domestic business for the Crown Prince. (Id. ¶ 8). Defendant H.E. Ali Bin Ahmed Al Dhahiri ("Dhahiri") is an agent of the Crown Prince and the Diwan. (Id. ¶ 9). The Crown Prince, the Diwan, Dhahiri, and the Architects will collectively be referred to as the "Defendants."

On June 20, 1989, the terms of the agreement between the parties were memorialized in a written contract (the "Contract Agreement"), which provided that plaintiff would construct, package, ship, deliver, install, and maintain for one year the ornate bronze grills and gates for the majalis entrance and family entrance to the Royal Palace. (Id. ¶¶ 15-16; Contract Agreement at 1). The project was to be completed within 11 months of the opening of a letter of credit by the Diwan and the principal amount set out in the Contract Agreement to be paid to plaintiff was $1,344,830.00 in United States dollars. (Compl. ¶¶ 16-17; Contract Agreement at 1). According to the Contract Agreement, payments for the project were to be made in accordance with a letter dated June 19, 1989, which detailed payment through the issuance of a letter of credit, with payment to be made for each item at certain specified times. (Id. ¶¶ 18-21). The Contract Agreement, which was signed by Setrak O. Agonian, president and sole shareholder of International Creative Metals, by Maher Lamie, Managing Director, on behalf of the Architects, and by S.K. Dastur on behalf of the Crown Prince, contains detailed specifications for the composition of the gates, including material to be used, tolerances, finishing and cleaning. (Contract Agreement). It also includes terms covering the period of maintenance, labor, insurance, site area, progress photographs and a breakdown of prices by item. The Contract Agreement further provides that the law governing the contract shall be the laws of the state of Abu Dhabi. (Contract Agreement at 2, 9).

Plaintiff asserts that during the course of performing the work under the Contract Agreement, defendants requested various modifications and alterations to the design of the project. (Affidavit of Setrak Agonian, dated March 27, 2003 ("Agonian Aff." ¶ 3)). According to plaintiff, the parties agreed to the modifications with an additional agreed-upon cost at

3

$1,060,518.00. (Id. ¶ 3).

In the Complaint, plaintiff alleges that defendants made various fraudulent misrepresentations regarding the dimensions and structural requirements of the gates and grills in order to induce plaintiff to enter into the contract for a far lower price than was ultimately determined to be necessary given the revisions in design submitted by the Architects. (Compl. ¶¶ 25-29). Plaintiff claims that Creative Metals performed the required work between 1989 and 1994. (Agonian Aff. ¶ 4). Plaintiff further alleges that between June 1989 and the spring of 1994, plaintiff incurred hundreds of thousands of dollars of costs in constructing the gates and grills in accordance with the new specifications, requiring plaintiff to obtain various loans to fund the project. (Compl. ¶ 32). Plaintiff asserts that it shipped the first set of gates at a cost of $1.892 million dollars, but that since the beginning of the project, defendant has only paid $786,187.00[3] out of a total cost of $2,405,348.00, including the modifications. (Id. ¶¶ 32-33; Agonian Aff. ¶ 5). Plaintiff seeks judgment in the amount of $1,619,161.00 as damages for breach of contract, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment and for the costs for goods sold and delivered. (Compl. ¶ 33; Agonian Aff. ¶ 5).

Pursuant to an Order of this Court, dated April 25, 2002, plaintiff served copies of the summons and complaint upon the defendants. When defendants failed to answer or otherwise respond to the complaint, plaintiff moved for entry of default, which was then entered by the Clerk of Court. By Order dated February 19, 2003, the parties were directed to submit papers

---

[3] It should be noted that at one point in the Complaint, the plaintiff states that it has received $786,184.00 from defendants (id. ¶ 40), but subsequently repeats the $786,187.00 figure later in the Complaint (id. ¶ 47), and Mr. Agonian, in his affidavit, represents that $786,187.00 has been paid. (Agonian Aff. ¶ 5).

4

with respect to plaintiff's claim for damages. Having received no opposition papers from the defendants, this Court reviewed the plaintiff's submission and reports as follows.

## DISCUSSION

1. Default

When a default is entered, the defendant is deemed to have admitted all of the well-pleaded factual allegations in the complaint pertaining to liability. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993). For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages. See Au Bon Pain Corp. v. Artect, Inc., 653 F.3d 61, 65 (2d Cir. 1981).

Jurisdiction is predicated upon the diversity of the parties, 28 U.S.C. § 1331. Plaintiff alleges that the defendants breached the Contract Agreement by failing to make payment in accordance with the terms agreed upon by the parties. Accepting plaintiff's allegations as true for purposes of this inquest, as this Court must given the default, the allegations do indeed establish the elements of liability necessary to state a claim for breach of contract under New York law. However, a review of the Contract Agreement between the parties reveals that under the terms of the agreement, the Contract is to be construed and governed by the laws of the state of Abu Dhabi. (Contract at 4, ¶ 2(b)).

Rule 44.1 of the Federal Rules of Civil Procedure permits a court "in determining foreign law . . . [to] consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.

Among other things, courts have considered affidavits from foreign law experts or practicing foreign attorneys, see, e.g, Overseas Dev. Disc. Corp. v. Sangamo Constr. Co., 840 F.2d 1319, 1324-26 (7th Cir. 1988) (considering testimony of Arab legal expert in determining loss under Kuwaiti law); Haywin Textile Prods. v. Int'l Fin. Inv. & Commerce Bank, 137 F. Supp. 2d 431, 435 (S.D.N.Y. 2001); treatises on foreign law, see Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 536 (1991); and translations of statutes and case law from the foreign country. See Grand Entertainment Group Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 489 (3d Cir. 1993); but cf. Films by Jove, Inc. v. Berov, 250 F. Supp. 2d 156, 192 (E.D.N.Y. 2003) (holding that American courts are not obligated to follow the lead of a foreign court in construing foreign law).

Plaintiff has submitted the Affirmation of Herbert S. Wolfson, Esq., dated January 30, 2004 ("Wolfson Aff."), an attorney licensed to practice law in the State of Pennsylvania. (Wolfson Aff. ¶ 2). According to Mr. Wolfson's Affirmation, he is fluent in Arabic and obtained a Master of Arts Degree in Arabic and Islamic Studies in 1991 from the University of Pennsylvania. (Id. ¶¶ 2, 3). He lived and practiced law in the Middle East from 1991 through December 1998, including one year which he spent with the firm of Baker & McKenzie in their Riyadh, Saudi Arabia office, and approximately five years practicing law in the United Arab Emirates, with the firm of Afridi & Angell, first in their Abu Dhabi office and then in Dubai. (Id. ¶ 4). While living in the United Arab Emirates, Mr. Wolfson advised commercial clients on numerous issues relating to the laws and practices of the courts in Abu Dhabi. (Id. ¶ 5). Since his return to the United States, he has continued to advise clients on the laws and practices in Middle Eastern countries, subscribed to various Middle Eastern legal publications, and published articles in legal developments in the United Arab Emirates. (Id. ¶¶ 6-7).

In his affirmation, Mr. Wolfson describes the structure of the government in the United Arab Emirates and its developing legal system. (Id. ¶¶ 9-13, 14-16). According to Mr. Wolfson, the Emirate Government of Abu Dhabi is headed by the Ruler of Abu Dhabi, Shaikh Zayed Bin Sultan Al-Nahyan ("Shaikh Zayed"), who has served as President of the United Arab Emirates since the country was formed in 1971. (Id. ¶¶ 11-12). Shaikh Khalifa Bin Zayed Al-Nahyan ("Shaikh Kalifa"), eldest son of Shaikh Zayed, administers the day to day business of Abu Dhabi and holds the dual titles of Crown Prince of Abu Dhabi and Deputy Ruler of Abu Dhabi. (Id. ¶ 12). The defendant in this case, Shaikh Sultan Bin Kalifa Al-Nahyan ("Shaikh Sultan") is the son of Shaikh Kalifa and head of the Diwan or Royal Court of the Crown Prince. (Id. ¶¶ 12-13, n.3).

According to Mr. Wolfson, the legal system in Abu Dhabi is a developing system, with a Civil Code and a Commercial Code, which are "quite general in nature and, in certain respects, ambiguous" in that both address the contract law issues here. (Id. ¶ 16). According to Mr. Wolfson, the Civil Code sets forth general rules governing contract formation, validity and enforcement. Under Article 4 of the Commercial Code, however, the transaction at issue would be considered a "commercial transaction" and it is unclear whether the Commercial Code was intended to supersede the Civil Code. (Id. ¶ 17). Since the statutes are relatively new, there is little case law to provide guidance and to the extent that decisions are reported at all, the courts in the United Arab Emirates do not recognize the doctrine of binding precedent. (Id. ¶ 19). Thus, according to Mr. Wolfson, the application of a particular law to a particular case cannot be determined until after a court issues a ruling in that case. (Id. ¶ 18).

Nevertheless, Mr. Wolfson opines that there are certain fundamental principles shared by

most legal systems, including the United Arab Emirates, which recognize that "a contract should be enforced unless (a) there are valid defenses to enforcement, (b) some defect in an essential element of the contract . . . renders the contract void, or (c) there are statutory or public policy grounds for denying enforcement." (Id. ¶ 22). Both the Commercial Code and Civil Code contemplate the enforcement of contracts. (Id. ¶¶ 23-24). Under the Commercial Code, a contract is to be enforced unless the "agreement conflicts with some mandatory commercial provision," or "conflict[s] with public order or morals." (Id. ¶ 23 (citing Commercial Code Article 2(1), 2(3))). The Civil Code similarly provides that each party to a contract "must perform that which he is obligated to do under the contract" and it is not permissible for either party to renege or rescind in the absence of mutual consent, an order of the court or a provision of law. (Id. ¶ 24). Islamic law principles, which are widely recognized in Abu Dhabi and often inform the court's decisions, similarly require the enforcement of contractual obligations. (Id. ¶ 25).

Although the defendants have defaulted in this action and thus, Mr. Wolfson has no basis on which to render an opinion as to whether there are valid defenses to plaintiff's claims, he has opined that he has been shown no evidence to suggest that the contract is "void" as defined under Article 210(1) of the Civil Code. (Id. ¶¶ 25-27).[4] Mr. Wolfson also notes that since defendants prepared the Contract Agreement, to seek to declare it void would be inconsistent with the concepts of good faith incorporated into United Arab Emirate law through Article 246(1) of the Civil Code. (Id. ¶ 28).

---

[4]Mr. Wolfson's affirmation contains two paragraphs numbered 25 and 26. This citation refers to the second set of paragraphs numbered 25 and 26 on page 7.

Thus, based on the allegations in the Complaint, which have not been refuted due to defendants' default, the Court finds that the Complaint states all of the elements necessary to establish a breach of contract under either the Civil or Commercial Codes of the United Arab Emirates.

2. Damages

Unlike allegations pertaining to liability, allegations in connection with damages are not deemed admitted in the context of a default judgment. The burden is on the plaintiff to establish his entitlement to recovery. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 158; Eisler v. Stritzler, 535 F.2d 148, 153-54 (1st Cir. 1976). Defendants who default are entitled to discovery regarding unliquidated damages. See Clague v. Bednarski, 105 F.R.D. 552, 553 (E.D.N.Y. 1985). While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not make the determination through a hearing." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (citing Transportes Aeroes De Angola v. Jet Traders Inv. Corp., 624 F. Supp. 264, 266 (D. Del. 1985)), aff'd, 973 F.2d 38 (2d Cir. 1989). Here, although the plaintiff filed reasonably detailed affidavits and exhibits pertaining to the damages incurred and defendants have failed to make an appearance, or respond and present evidence on the issue of damages, the Court nevertheless held an evidentiary hearing on the issue of damages.

a. Measure of Damages

Mr. Wolfson has submitted his opinion regarding the calculation of damages under the

9

Civil Code and the Commercial Code. He opines that although the statutory law provides little guidance, he believes that plaintiff should be entitled to recover the agreed upon contract price, including those amounts that are attributable to additional work performed by plaintiff at the defendants' request. (Id. ¶ 29).

(i) Civil Code

According to Mr. Wolfson, Article 243(2) of the Civil Code of the United Arab Emirates, imposes the general rule on the parties to perform their respective obligations under the contract. Thus, the buyer must pay the contract price when due. (Id. ¶ 30).

Under Article 872 of the Civil Code, the contract at issue may be considered a "work contract" which is defined as a contract "whereby one of the parties (the contractor) undertakes to make a thing or to perform work against consideration that the other party (the project owner) undertakes to provide." (Id. ¶ 31). Under Article 881 of the Civil Code, the project owner is required "'to pay the consideration upon delivery of the property contracted for, unless there is an agreement or a custom to the contrary.'" (Id. ¶ 32). Article 887, which deals with lump sum contracts, requires the contractor to pay increased costs incurred from the execution of the agreed-upon plan, but requires the project owner to be responsible for increased costs attributable to changes or extra work performed with the consent of the project owner. (Id. ¶ 33).

Thus, in this case, if the extra work was performed with defendants' consent, plaintiff would be entitled to recover an additional amount calculated in accordance with the agreement. (Id. ¶ 35). If the additional amount cannot be determined pursuant to the Contract Agreement, then plaintiff is entitled to recover "fair remuneration, together with the value of the materials he

10

has provided as required by the work." (Id. ¶ 36). If the Contract Agreement is a purely civil transaction, there is no provision under the Civil Code for interest payments. (Id. ¶ 37).

(ii) Commercial Code

Under the Commercial Code, there is no express requirement for the buyer to pay the contract price, although according to Mr. Wolfson, such an obligation is implied. (Id. ¶ 38). Mr. Wolfson opines that since plaintiff is likely to be deemed a merchant or commercial business pursuant to Articles 4, 11, 12 of the Commercial Code, it is irrelevant whether defendants fall outside the definition because the Commercial Code expressly covers transactions which are commercial with respect to one party even though civil as to the other party. (Id. ¶ 39).

If the Commercial Code applies to the transaction, Mr. Wolfson has opined that under Article 2, which would invoke the conditions of the contract, plaintiff would be entitled to recover the contract price including any agreed-upon price for the extra work. (Id. ¶ 40). In addition, under the Commercial Code, plaintiff would be entitled to recover simple interest calculated at the rate set in the contract or at the prevailing market rate, not to exceed 12%. (Id. ¶ 41).

b. Testimony on Damages

On February 20, 2004, an inquest on damages was held, at which Setrak O. Agonian, president of International Creative Metals, and Thomas Hagerty, a now retired engineer from STV Group, testified on behalf of plaintiff.

Mr. Agonian testified that he immigrated to the United States in 1967, where he

11

established a small metal shop called Creative Metals Sculpture Shop which was engaged in the production of architectural metal art creations. (Tr. at 12).[5] In approximately 1979 or 1980, Mr. Agonian was commissioned to design a metal sculpture for the Abu Dhabi National Library. (Id. at 15). As a result of his success with this project, he received acclaim from the American Ambassador and his company was thereafter registered in Abu Dhabi as "one of the best performing compan[ies]." (Id. at 16).

He was later asked to design and construct the logo for the Abu Dhabi Outer Monetary Fund Bank, for which he received a gold medal. (Id. at 19). He also did work in the Children's City in Alaine, also in the United Arab Emirates. (Id. at 20-21). Mr. Agonian has also done work in New York City, as a landmark fabricator for the renovation at Rockefeller Center, the planters at the Waldorf Astoria, and at the Helmsley Building at 230 Park Avenue. (Id. at 21-22).

In 1998, Mr. Agonian was invited to submit a bid for the construction of the large metal gates and fence that surrounds the palace of Shaikh Khalifa. (Id.) He explained the problems with salt and humidity from the Persian Gulf and described his efforts to learn about the various problems. He was approached by Mr. Maher Lamie of the Architectural and Engineering Consultants. (Id. at 22-23). Mr. Lamie asked Mr. Agonian to bid on two palaces, one of which was a contract for $2.46 million which was awarded to someone else. (Id. at 23). He was, however, awarded the contract to build two giant doors, 30 feet high, and 20 feet wide with a regular gate for the palace of Shaikh Khalifa. (Id. at 24; Exs. 1, 2, 3A, 3B). In addition, he was asked to construct several other gates and grills including the family entrance door and pedestrian

---

[5]Citations to "Tr. at" refer to pages in the transcript of proceedings held before this Court on February 2, 2004.

12

doors. (Id. at 28; Ex. 6).

In his affidavit, Mr. Agonian set forth in detail the work contracted for, the extra work requested by defendants and the payments be received. Specifically, the agreement called for production of six metal items: the Fixed Railing Type II, Fixed Railing Type I, Bronze Doors (D1), Bronze Gates (G2) and (G1), Family Entrance, and Main Entrance Gates. (Agonian Supp. Aff. ¶ 2).[6] Defendants subsequently requested that modifications be made to all six items and agreed to pay for those modifications. (Id.) According to Mr. Agonian, the modifications were made at the request of Maher Lamie, the Crown Prince's architect, and these modifications were discussed in detail with Mr. Agonian and with Thomas Hagerty of STV Group during the course of production. (Id. ¶ 3).

The first five items with the requested modifications, were completed, and installed by plaintiff. (Id.) Specifically, he completed and installed all of the smaller doors; the only thing that was not completed were the two large central doors where the costs of construction exceeded the contract price. (Id. at 29). In return, defendants paid the original contract price on the five completed items but failed to pay for the modifications. (Id.) On January 19, 1993, plaintiff sent Mr. Lamie a fax detailing the additional cost for the modifications that Mr. Lamie had insisted be made and had agreed would be paid for. (Id. ¶¶ 4-5). The final items, the Main Entrance Gates, were produced and plaintiff offered to deliver and install them. (Id. ¶¶ 5-6). However, defendants continued to refuse to pay for any of the modifications on the Main Entrance Gates or on the five previously delivered items. (Id.) When defendants refused to pay for the

---

[6]Citations to "Agonian Supp. Aff." refer to Plaintiff's Supplemental Affidavit of Damage Calculations, dated January 29, 2004.

13

modifications on the first five items, plaintiff realized that they would never pay once he delivered the Main Entrance Gates. (Id.) Therefore, he withheld delivery of the Gates. (Id.)[7] The plaintiff has retained the Main Entrance Gates at his shop in Queens. (Id.; Exs. 1, 2, 3A, 3B).

Based on the documents presented in support of Mr. Agonian's request for $1,619.161.00 in total damages, it appears that the amounts owed are as follows:

| Gates and Grills | Contract Price | Cost of Modifications | Amount Paid | Amount Due |
|---|---|---|---|---|
| Fixed Railing Type II | $115,580 | $3,610 | $115,580 | $3,610 |
| Fixed Railing Type I | $269,688 | $103,380 | $269,688 | $103,380 |
| Bronze Doors (D1) | $110,764 | $59,720 | $110,764 | $59,720 |
| Bronze Gates (G2 & G1) | ($69,830 * 2 =) $139,660 | $78,015 | $139,660 | $78,015 |
| Family Entrance | $150,495 | $132,340 | $150,495 | $132,340 |
| Main Entrance Gates | $558,643 | $683,453 | $0 | $1,242,096 |
| **TOTALS** | **$1,344,830** | **$1,060,518** | **$786,187** | **$1,619,161** |

Thomas F. Hagerty testified that he graduated from the University of Pennsylvania with a degree in engineering, working first for RCA and then spending most of his career at STV Incorporated. (Tr. at 49). At the time his firm was approached by Mr. Agonian, Mr. Hagerty held the position of project manager, retiring in July 2002 as a vice president. (Id. at 50).

According to Mr. Hagerty, he became aware of the requested modifications based on three way telephone conversations involving Mr. Agonian and Maher Lamie, as well as through

---

[7] According to plaintiff, there were extensive settlement discussions in which defendants agreed to pay $500,000 to settle the claims, but plaintiff rejected that offer.

review of various correspondence received from Mr. Lamie. (Hagerty Aff. ¶ 2).[8] This correspondence outlined various modifications to the project, including notes made on the original drawings sent to plaintiff. (Id.)

Based on his experience and his knowledge of the project, Mr. Hagerty has opined that the costs for the modifications requested by plaintiff are reasonable. (Id. ¶ 3).

c. Analysis

Based on the information provided by Mr. Wolfson, which has not been challenged by defendants, it appears that if the contract at issue falls within the purview of the Civil Code, plaintiff would be entitled to recover the cost of extra work or additional costs incurred as a result of changes or modifications to the contract if such work was done at defendants' request. Here, both Mr. Agonian and the non-party witness, Mr. Hagerty, have offered credible testimony that the work at issue here was done at the specific request of the defendants' agent, Maher Lamie, who not only demanded that the modifications be made but also represented that any resulting additional costs would be paid for by defendants.

In determining what amount should be awarded to plaintiff to compensate for this additional work, Mr. Wolfson has opined that under the Civil Code, "fair remuneration," along with the value of the materials, would be the appropriate measure of damages, but under the Civil Code, there would be no award of interest. (Wolfson Aff. ¶¶ 36-37).

If the contract is governed by the Commercial Code, Mr. Wolfson has opined that

---

[8] Citations to "Hagerty Aff." refer to the Affidavit of Thomas F. Hagerty, dated January 30, 2004.

plaintiff would also be entitled to recover the contract price plus any agreed-upon price for the extra work. In addition, interest would be available under the Commercial Code.

Here, given the testimony of Mr. Agonian, buttressed by the opinion of Mr. Hagerty, an expert in this field, this Court finds that a reasonable award of damages would be $1,619,161.00 based on the costs set forth in Mr. Agonian's affidavit for each of the modified items. Under either the Civil Code or the Commercial Code, as interpreted by Mr. Wolfson, it appears that this would be an appropriate measure of damages. Certainly, under New York law, this measure of damages would be considered reasonable. See Wallace Steel, Inc. v. Ingersoll-Rand Co., 139 F.2d 112, 115 (2d Cir. 1984) (citing New York Water Service Corp. v. City of New York, 4 A.D.2d 209, 213, 153 N.Y.S.2d 538, 542 (1st Dep't 1957)) (noting that "[i]n fixing damages for breach of contract, the intent is to put the plaintiff in as good a position as he would have been in had the defendant abided by his agreement"); Bippley v. Hollenback, 228 A.D.2d 983, 983, 633 N.Y.S.2d 852, 854 (3d Dep't 1996). However, since it is not clear whether the courts in Abu Dhabi would apply the Civil Code or the Commercial Code, this Court declines to recommend an award of interest at this time.

In summary, this Court respectfully recommends that plaintiff be awarded $1,619,161.00 in damages based on defendants' breach of contract.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, within a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
   May 4, 2004

/S/

Cheryl L. Pollak
United States Magistrate Judge